RUMFORD CHEMICAL WORKS v. NEW YORK BAKING POWDER CO.
et al.

(Circuit Court, S. D. New York.   August 27, 1903.)

**1. PATENTS—INVENTION—CHANGE IN FORM OF MATERIAL.**
Merely changing the form or condition of a substance by mechanical means, by grinding or reducing it to a finer state, or conversely by producing it in a granular instead of a powdered form, does not make it a new article, in the sense of the patent law, where it remains unchanged in composition and properties.

**2. SAME—BAKING POWDER.**
The Catlin patent, No. 474,811, for a baking powder or preparation of the usual composition, but in which the phosphoric acid element is in granular form essentially free from pulverulent material instead of in a finely pulverized condition, as in prior compounds, the purpose being to render it less subject to atmospheric change, so that it may be put up in less expensive packages, is void for lack of patenable invention, in the absence of proof that the product of the patent possesses different properties in use than those of the prior art.

In Equity.   This cause comes here at final hearing upon pleadings and proofs.   The bill is in the usual form for injunction and accounting, infringement being charged of United States letters patent 474,811 to Charles A. Catlin (assignor to plaintiff), May 17, 1892, for baking powder.

Philip Mauro, for complainant.

Briesen & Knauth (Paul Bakewell, of counsel), for defendants.

LACOMBE, Circuit Judge.   The specifications are more than usually full, and an extended quotation from them will sufficiently present the questions whose decision seems controlling of the main issue in the case.   The patentee states that his—

"* * * invention relates to that class of baking preparations in which the active acid agent is, either in whole or in part, some form of phosphoric acid or acid phosphate.

"Under the general head of baking preparations may be included, first, the ordinary baking powder, composed of a mixture of the phosphoric acid element with a carbonate or bicarbonate as active agents; second, the phosphoric acid element, when put up alone, as is sometimes done, without the carbonate or bicarbonate; third, preparations in which the phosphoric acid element and carbonate or its equivalent are put up in separate packages, to be mixed before use; and, fourth, preparations known as 'self-raising flour,' 'quick-raising flour,' 'prepared flour,' and by various names, in which the phosphoric acid element and carbonate are mixed by the manufacturer with flour in proper proportions for use in making bread.

"Broadly stated, the present invention consists in the production of a baking preparation in which the phosphoric acid element is in a practically uniform granular condition, free from pulverulent phosphatic material.   This granular phosphoric acid material constitutes a new product or article of manufacture, possessing peculiar and distinctive properties and characteristics of great value for the purposes stated, as will be hereinafter explained.

"As is well known to those familiar with such matters, preparations of the kind above referred to, as ordinarily prepared, while possessing the highest dietetic value and leavening efficiency, possess, nevertheless, the property of serious deterioration when freely exposed to atmospheric humidity, compelling the manufacturer to employ extraordinary and expensive means in packing to protect them from this influence.

"Heretofore it has been the aim of the manufacturer to produce the phosphatic element in the finest pulverulent condition possible, believing that thus, and thus only, could highest efficiency be obtained. I have discovered, however, that the fine pulverulent condition of the commercial phosphatic powders is not necessary to highest efficiency in the leavening quality, but is rather detrimental to it. Indeed, the results of my experiments have demonstrated that, when a baking powder having the phosphatic element in a granular condition is used in place of one containing that element mainly in a fine pulverulent form, the leavening efficiency of the preparation is materially augmented, while at the same time the deterioration quality is retarded, if not entirely overcome. The reason for the increased efficiency will be readily understood when we take into consideration the fact that within limits a somewhat slow evolution of the leavening carbonic acid gas is desirable, in order that too much of it may not escape from the dough during the mixture and kneading before the loaf is placed in the oven, but rather that a considerable part of it shall remain to be evolved during the baking process, that the dough may be at its highest expansion when hardened by the baking into the permanent cellular structure of the finished loaf. The slow evolution quality is not possessed in a marked degree by phosphatic baking powders, as heretofore prepared, and especially is it lacking when the phosphatic element employed is of a highly acidulous character. This is due to the ready solubility of the acid agent in its finely powdered condition, which, of course, brings it into rapid reaction with the alkaline bicarbonate, and causes the rapid evolution of its gas. When, on the contrary, the particles of the acid are in a coarse condition, solution and consequent reaction are retarded. In practice I have found, therefore, that by giving to the phosphatic element of the baking powder a uniformly coarse condition the property of slow evolution of the gas is increased, and a consequent marked increase in baking efficiency is obtained. In this respect, therefore, the new product possesses a distinct advantage over phosphatic powders heretofore made and used.

"As is well-known, acid phosphates possess naturally a highly deliquescent property, and this to such a degree when reduced to a finely powdered state and exposed to variable atmospheric conditions that they at times greedily absorb moisture, and thereby acquire of themselves alone (or impart to any mixture of powders of which they form a considerable proportion) a sticky, clammy condition. This absorption of the said element, when packed separately in the usual fine condition, causes a recrystallization of the powder, which in such case hardens into a caky crystalline mass, unsuitable for the use intended. Moreover, such a powder or mixture of powders is difficult to pour either in or out of any small-necked receptacle, and is especially difficult to measure out in the quantities in which baking powders are used. This objectionable quality in phosphatic powders, I have found, does not attach to any serious extent to the new granular preparation. The reason for this improvement is plainly apparent when we take into consideration the fact that in the same weight of material the surface exposed to the atmospheric influence is greatly increased the finer its pulverulent condition. * * *"

The specification proceeds:

"The improved keeping quality of baking powder mixtures containing the acid phosphates in a uniformly granular condition is due partly to the reduced deliquescent property of the acidulated material in such condition, already referred to, and partly to the greatly reduced number of points of contact which such granular acidulated material presents to the carbonate, with which it is in admixture, in proportion to the weight employed. Another reason for this is the increased size of the interspaces between the active particles due to this granular condition, which permits, when a fine diluent is employed, of a more complete introduction of said diluent between these particles and their isolation from each other."

The patentee next describes the method of preparing his product, which is acidulated phosphate so reduced by grinding that it will sift through a No. 9 silk bolt, but not through a No. 16 silk bolt. The

evidence shows that theretofore the material had been used as it came through a No. 9 bolt, containing granules of the size of the patent, mixed with so large a proportion of fine particles that it was not essentially free from pulverulent (powdered or dust-like) material, but, on the contrary, was characteristically pulverulent. The patentee states, however, that he does not restrict himself to the method of production described nor to the particular size of granules set forth.

The claims are:

"(1) A baking preparation containing phosphoric acid or its compounds in granular condition, essentially free from pulverulent phosphatic material, substantially as described.

"(2) A baking preparation composed of a phosphoric-acid element in granular form, essentially free from pulverulent phosphatic material, in admixture with a carbonate or bicarbonate, as set forth."

The evidence produced by the complainant shows, more forcibly even than the specifications indicate, that the object sought to be attained was the production of material which would better resist the deteriorating effects of moisture in the atmosphere, and could thus be kept without losing its efficiency, both when packed in its commercial receptacles and when more freely exposed during domestic use. The specification correctly states that existing preparations "possessed the highest dietetic value and leavening efficiency." That does not necessarily mean that they were not susceptible of improvement in those particulars; but the investigations of the patentee were directed, not to such improvement, but to prevent their "serious deterioration when freely exposed to atmospheric humidity, compelling the manufacturer to employ extraordinary and expensive means in packing to protect them from this influence." The patent fully, clearly, and accurately sets forth the difficulty which existed in dealing with such highly deliquescent material "when reduced to a finely powdered state," and the sole remedy suggested is its reduction to a state not finely powdered, but uniformly granular (or containing only a negligible quantity of the powder), so that less surface is exposed to the atmosphere and to the carbonate with which it is in admixture. The evidence indicates that the phosphoric acid element was not, theretofore, used in a condition so free from pulverulent material, and that the change of form has decreased the absorption of moisture, and thus prevented deterioration during the period it is kept before being put to use. But the difficulty with sustaining a patent for such a change of form produced by mechanical division is found in the propositions laid down by the Supreme Court (affirming the Circuit Court, 1 Ban. & A. 497, Fed. Cas. No. 9,607) in Glue Co. v. Upton, 97 U. S. 6, 24 L. Ed. 985. That case presented the converse of the one at bar. There the absorption of moisture by the glue was accelerated by increasing its fragmentary division; here the absorption of moisture by the phosphatic material is retarded by decreasing its fragmentary division. The evidence indicates that in decreasing that division Catlin reversed the practice of his predecessors, and that the result has been to enable the manufacturers to market efficient phosphatic material alone, or combined with the carbonate, in more economical packages; but it is not perceived how, under the decision cited, the

patent can be sustained unless the difference of form effects some alteration or improvement in the properties of the material.

That this difficulty would be encountered in sustaining a patent for his No. 9 to No. 16 granules seems to have been fully appreciated by the patentee, or, rather, by his patent solicitor, who carefully prepared the specifications, apparently to avoid such difficulty by indicating that the patentee's investigations showed that reduction to the granular state, essentially eliminating the powder, affected the properties of the composition.

It is frequently stated in the specifications that the new product possesses peculiar and distinctive properties. It is asserted that the fine pulverulent condition of the commercial baking powder is rather detrimental to the highest efficiency in the leavening quality, while by using the same in a granular condition the leavening efficiency of the preparation is materially augmented. The reason for this is pointed out at some length in a passage which will be found in the quotation supra, and which ascribes the result to the slower evolution of carbonic acid gas during mixing, kneading, and baking. "In practice," says the specification, "I have found that by giving the phosphatic element a uniformly coarse condition the property of slow evolution of the gas is increased, and a consequent marked increase in baking efficiency is obtained."

If this were all so, there would be no difficulty in granting the prayer of the bill, for infringement is plain, and the various other defenses— anticipation, abandonment, and prior use—are not especially persuasive. But the record does not sustain the statements in the specification. Interrogated specifically as to whether there is a greater slowness of evolution of carbonic acid gas obtained by the granular condition of the phosphate, the expert called by complainant says that he does not know. There is not a scintilla of evidence to show that the product of the patent has commended itself to the public as making better bread. The evidence of the principal disinterested witness called from the trade (Clotworthy) is to the effect that between the complainant's fine powder (sold in bottles) and the granular compound of the patent he has never discovered any difference. There is considerable testimony as to experiments made by complainant's employés to determine whether the phosphatic material in granular form would dissolve readily enough in the dough to perform its office by combination with the bicarbonate. Sometimes the results of these experiments were satisfactory, sometimes not; black specks, or black and yellow spots, appearing to spoil the appearance of the loaf. The only evidence to sustain the proposition that the substitution of granules for powder augmented the leavening efficiency is given by the patentee himself. He says:

"The fine condition gives an even, velvety structure, while the other gives a more decidedly porous and more attractive structure to the bread. * * * The effects of granulation in the ultimate results appeared to me to give a very much more presentable loaf, though perhaps not to all others, than where the materials were in fine condition."

This statement is but the pardonable exaggeration of the inventor, who has given time and thought through several years to his experi-

ments, and who, with conspicuous honesty and frankness, admits that others think differently. The effect produced on the court by an examination of the testimony is that the most which can be said is that the substitution of a granular mechanical division for a pulverulent mechanical division of the phosphatic material does nòt so change its properties as to destroy or impair its leavening efficiency. That such efficiency is augmented is not proved. Under the principles laid down in Glue Co. v. Upton, supra, the bill must be dismissed, with costs.

### On Rehearing.

#### (October 3, 1903.)

All the points raised on this application for rehearing were before the court, and were carefully considered before decision at final hearing. This court may have erred as to the conclusion that Glue Co. v. Upton, 97 U. S. 3, 24 L. Ed. 985, was controlling of the case at bar, but it did so only after consideration of all that is now presented as ground for reaching a different conclusion.

The petition for reargument is denied.